# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

ELENA STURDZA,

Plaintiff,

v.

UNITED ARAB EMIRATES, et al.,

Defendants.

Civil Action 98-02051 (HHK)

## MEMORANDUM

Plaintiff, Elena Sturdza, retained attorney Nathan Lewin to represent her in this civil action on a contingency fee basis after this Court, Judge Colleen Kollar-Kotelly presiding, granted summary judgment against her on some of her claims and dismissed others. Sturdza appealed the judgment. During the appeal proceedings, Lewin moved for the appointment of a guardian ad litem for his client ("Guardian ad Litem Motion"). Instead of resolving the Guardian ad Litem Motion, the United States Court of Appeals for the District of Columbia ("D.C. Circuit") remanded the record and the motion for this Court's disposition.[1] *Sturdza v. United Arab Emirates*, 2002 WL 1285543 (D.C. Cir. June 6, 2002). After considering the motion, the opposition thereto, the Report and Recommendation of a United States Magistrate Judge recommending that the motion be denied, Lewin's objections to the magistrate judge's recommendation, Sturdza's reply to Lewin's objections, the refusal of Sturdza to appear before this Court to show cause why she should not be ordered to undergo a mental examination, and

---

[1]  Unless stated otherwise, the designation "this Court," for clarity and ease of reference, denotes proceedings before and rulings by United States District Judges Colleen Kollar-Kotelly and Henry H. Kennedy, Jr. and United States Magistrate Judge John M. Facciola.

the entire record of this case, this Court granted the Guardian ad Litem Motion and appointed a

guardian for Sturdza.

On appeal of this Court's ruling, the D.C. Circuit determined that this Court had not

given Sturdza "notice and an opportunity to be heard" regarding the appointment. *Sturdza v.*

*United Arab Emirates*, 562 F.3d 1186, 1188 (D.C. Cir. 2009). Consequently, the D.C. Circuit,

on April 10, 2009, vacated the appointment of a guardian ad litem and remanded the record and

the motion again – an action the D.C. Circuit found it was "compelled" to take – so that Sturdza

could be given the notice and opportunity to be heard that the D.C. Circuit said she was not

afforded after its first remand. *Id*. at 1189–90.

Upon consideration of the record of this case for a second time, including Sturdza's

statements at a hearing held after the D.C. Circuit's second remand, this Court concludes that the

Guardian ad Litem Motion should be granted for the reasons that follow.[2]

## I. BACKGROUND

The facts of this unusual and complicated case[3] have been set forth in several memoranda

---

[2] On May 27, 2009, this Court issued an order granting the Guardian ad Litem Motion for
a second time with the hope that the order would set in motion, as soon as possible, the process
that will lead to a final resolution of this matter by the D.C. Circuit. The order indicated that this
Court would set forth the rationale for its decision in a forthcoming memorandum. This
memorandum sets forth the Court's rationale.

[3] The description, "unusual and complicated," is an understatement. Indeed, this case has
reached *Bleak House* proportions. *Bleak House*, the ninth novel of Charles Dickens considered
by many to be one of his finest, was based on a long-running litigation in England's Court of
Chancery that had far-reaching consequences for all involved in the tale. Dickens's trenchant
characterization of the slow, arcane, Chancery law process provides a memorable expression of
the injustices of the nineteenth century English legal system. Ironically, Dickens's penetrating
comment on the flaws of that system was based, in part, on his experiences as a law clerk, and, in
part, on his experiences as a Chancery litigant seeking to enforce his *copyright* in his earlier
books.

and orders.[4]  Nevertheless, a relatively detailed summary of certain rulings, filings, and proceedings in this case pertinent to the Guardian ad Litem Motion is warranted here.

## A.     Proceedings in this Court Before First Remand

Sturdza, an architect, filed this action in 1998, asserting causes of action grounded on her belief that her architectural design for the new embassy of the United Arab Emirates ("UAE") was stolen from her.  Defendants are the UAE, Angelos Demetriou, a rival architect, and Demetriou's firm.  According to Sturdza, the UAE told her that she had won the competition phase of the process that the UAE had used to obtain an architectural design for its embassy.  Thereafter, for two years, the UAE and Sturdza engaged in contract negotiations.  At some point, however, the contract negotiations ceased unexpectedly, and Sturdza learned that the UAE had used Demetriou's design to construct the embassy.  *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1292 (D.C. Cir. 2002).  Sturdza contends that Demetriou's design "copied and appropriated many of the design features that had been the hallmark of her design."  First Am.

---

[4]  This judicial officer authored the following memoranda and orders:  Mem. Op. and Order (Sept. 28, 2005) [#173]; Mem. Op. and Order (Aug. 26, 2003) [#170]; Order to Show Cause (Apr. 24, 2003) [#161].

Judge Kollar-Kotelly authored the following memoranda:  *Sturdza v. United Arab Emirates*, 2000 U.S. Dist. LEXIS 22090 (D.D.C. Oct. 28, 2000); *Sturdza v. United Arab Emirates*, 1999 U.S. Dist. LEXIS 23173 (D.D.C. Dec. 22, 1999); *Sturdza v. United Arab Emirates*, 1999 U.S. Dist. LEXIS 23172 (D.D.C. July 22, 1999).

United States Magistrate Judge John M. Facciola issued the following reports:  Report and Recommendation, *Sturdza v. United Arab Emirates*, 2003 WL 102991 (D.D.C. Jan. 9, 2003); Report and Recommendation (June 15, 2001) [#112].

The United States Court of Appeals rendered the following order and opinions:  *Sturdza v. United Arab Emirates*, 562 F.3d 1186 (D.C. Cir. 2009); *Sturdza v. United Arab Emirates*, 2002 WL 1285543 (D.C. Cir. June 6, 2002); *Sturdza v. United Arab Emirates*, 281 F.3d 1287 (D.C. Cir. 2002).

Compl. ¶ 47 (Sept. 25, 1998).

Sturdza's amended complaint set forth claims for copyright infringement, breach of contract, quantum meruit, conspiracy to commit sex discrimination, conspiracy to commit fraud, tortious interference with a contract, and intentional infliction of emotional distress. Resolving dispositive motions filed by the UAE and Demetriou, this Court dismissed some of Sturdza's claims and granted summary judgment as to others. *Sturdza v. United Arab Emirates*, 2000 U.S. Dist. LEXIS 22090 (D.D.C. Oct. 28, 2000); *Sturdza v. United Arab Emirates*, 1999 U.S. Dist. LEXIS 23173 (D.D.C. Dec. 22, 1999); *Sturdza v. United Arab Emirates*, 1999 U.S. Dist. LEXIS 23172 (D.D.C. July 22, 1999).

With respect to Sturdza's breach of contract and quantum meruit claims, this Court granted the UAE's motion for summary judgment because Sturdza is not a District of Columbia licensed architect and long-standing doctrine in the District of Columbia operates to prevent an unlicensed contractor from recovering on breach of contract and quasi contract (quantum meruit) causes of action. *Sturdza*, 1999 U.S. Dist. LEXIS 23173. This Court stated:

> As the District of Columbia Court of Appeals has repeatedly reaffirmed, "'in the District of Columbia it is a principle of long standing that an illegal contract made in violation of a statutory prohibition designed for police or regulatory purposes, is void and confers no rights upon the wrong doer.' . . . Our decisions rejecting any deviation from this rule span more than a quarter-century." *Cevern v. Ferbish*, 666 A.2d 17, 19-20 (D.C. 1995) (quoting *Capital Constr. Co. v. Plaza West Coop. Ass'n*, 604 A.2d 428 (D.C. 1992)); *see also Truitt v. Miller*, 407 A.2d 1073, 1079 (D.C. 1979) ("The rule simply stated is that a contract made in violation of a licensing statute that is designed to protect the public will usually be considered void and unenforceable, and the party violating the statute cannot collect monies due on a quasi-contractual basis."). The District of Columbia has not wavered in its commitment to this policy, despite sometimes harsh results. *See Cevern*, 666 A.2d at 20. Thus, the Court of Appeals has applied this policy to void contracts even where the party seeking to enforce the contract meets all the other eligibility requirements for licensing. *See Saul v. Rowan Heating & Air*

*Conditioning, Inc.*, 623 A2d 619, 621-22 (D.C. 1993).

*Sturdza*, 1999 U.S. Dist. LEXIS 23173, at *14.

**B.      Proceedings Before the D.C. Circuit**

Sturdza appealed this Court's judgment against her.  During the appeal proceedings, two uncommon motions were filed.  First, on October 11, 2001, the UAE and Demetriou jointly moved to dismiss Sturdza's appeal pursuant to D.C. Circuit Rule 38.  Joint Mot. of Appellees for Entry of Order Dismissing Appeal (D.C. Cir. Oct. 11, 2001) ("Joint Motion for Dismissal").[5] Then, on May 29, 2002, Lewin filed the Guardian ad Litem Motion, seeking the appointment of a guardian for Sturdza pursuant to Rule 1.14 of the District of Columbia Rules of Professional Conduct.[6]  Guardian ad Litem Motion (D.C. Cir. May 29, 2002).

---

[5]  D.C. Circuit Rule 38 provides that a court may impose sanctions, including dismissal:

> When any party to a proceeding before this court or any attorney practicing before the court fails to comply with the [Federal Rules of Appellate Procedure], these rules, or an order of this court, or takes an appeal or files a petition or motion that is frivolous or interposed for an improper purpose, such as to harass or to cause unnecessary delay . . . .

[6]  Rule 1.14(l) of the District of Columbia Rules of Professional Conduct provides:

> (a) When a client's capacity to make adequately considered decisions in connection with a representation is diminished, whether because of minority, mental impairment or for some other reason, the lawyer shall, as far as reasonably possible, maintain a typical client-lawyer relationship with the client.
> (b) When the lawyer reasonably believes that the client has diminished capacity, is at risk of substantial physical, financial or other harm unless action is taken and cannot adequately act in the client's own interest, the lawyer may take reasonably necessary protective action, including consulting with individuals or entities that have the ability to take action to protect the client and, in appropriate cases, seeking the appointment of a surrogate decision-maker.
> (c) Information relating to the representation of a client with diminished capacity is protected by Rule 1.6.  When taking protective action pursuant to paragraph (b),

In their Joint Motion for Dismissal, the UAE and Demetriou argued that dismissal of

Sturdza's appeal was warranted because

> Sturdza . . . and her counsel have, in direct violation of an Order of this Court:
> filed *pro se* written communications; divulged confidential mediation matters; and
> submitted impertinent, scandalous and prejudicial histories, opinions, facts and
> arguments.  Appellant's conduct has been willful and continuous, and is devoid of
> colorable justification.

Joint Motion for Dismissal at 2.

Before addressing the merits of Sturdza's appeal, the D.C. Circuit dealt with the

"threshold issue" presented by the Joint Motion for Dismissal.[7]  *Sturdza*, 281 F.3d at 1293.  The

_____

the lawyer is impliedly authorized under Rule 1.6(a) to reveal information about
the client, but only to the extent reasonably necessary to protect the client's
interests.

Lewin also cites Rule 27 of the Federal Rules of Appellate Procedure as authority for his
motion.  Rule 27 merely governs the procedures for motions practice in the U.S. courts of appeals.

[7]  Explaining that "[t]he filings about which the UAE and Demetriou complain[ed] began
after . . . Lewin submitted his opening brief," *Sturdza*, 281 F.3d at 1293, the D.C. Circuit
summarized the circumstances – all of which happened during the appeal proceedings – as
follows:

> In several pro se motions and other documents, Sturdza accused Lewin of
> failing to follow her directions and sought to bring to our attention her own view
> of Demetriou's and the UAE's conduct.  In one motion, Sturdza attempted to add
> "critical information" to her appellate brief that she said was "either missing or
> false" . . . .  Denying that motion, we reminded Sturdza that "[a]ppellant has
> counsel whom she has retained and thus is her representative in this appeal. . . . So
> long as appellant is represented by counsel, the attorney speaks on her behalf
> before this court."
>
> Undeterred, Sturdza made additional pro se filings accusing Lewin of
> failing to represent her properly.  For example, in a "motion for reconsideration,"
> she charged that Lewin "intentionally delayed submissions for [her] review . . . to
> deprive her of adequate time to act," reiterating that her appellate brief contains
> "false statements, misleading statements and omissions [of] important facts."
>
> Lewin filed several affidavits in which he denied Sturdza's accusations
> and described his efforts to consult with Sturdza regarding her appeal.  Lewin also
> submitted copies of correspondence illustrating his efforts to communicate with

D.C. Circuit denied the motion, finding that Lewin's and Sturdza's filings "fall far short of Rule

38 sanctionable behavior." *Id.* at 1294.  In addition to finding that the challenged filings were not

sanctionable, the D.C. Circuit commented on Lewin's conduct in dealing with Sturdza and her

inappropriate submissions to the court.  The D.C. Circuit said, "[w]e believe Lewin proceeded

with the *utmost propriety*, delicately balancing his ethical obligations to [Sturdza] and his

responsibilities as an officer of this court. . . . *This is precisely how appellate counsel should*

*behave; indeed, we expect all lawyers practicing in this court to resist a client's desire to make*

*'poor legal arguments' or 'unsubstantiated factual allegations' . . . .*" *Id.* (emphasis added).

After it resolved the motion for sanctions, the D.C. Circuit turned to the merits of

Sturdza's appeal.  The D.C. Circuit affirmed this Court's dismissal of Sturdza's sex

discrimination claim, reversed its grant of summary judgment as to her copyright claim and its

---

Sturdza.  In one such letter, Lewin explained that "based on [his] professional
judgment and experience," he decided to omit certain material from the appellate
brief, namely, "poor legal arguments, unsubstantiated factual allegations and other
material that was not suitable for the brief and would have reduced its
persuasiveness[.]"  Lewin attached to his reply brief a copy of Sturdza's
handwritten account of the merits of her case – a document containing numerous
strongly worded allegations against Demetriou and the UAE, her district court
counsel (not Lewin), and the district court judge.  *See* Appellant's Reply Br.
Addendum at 8–9 (stating among other things that the appellees engaged in a
"planned theft" of Sturdza's design and that the UAE had "exercise[d] its power
over [Sturdza's trial] counsel and the U.S. judge").  Explaining why he included
this material, Lewin stated, "I do not wish to be a barrier to Ms. Sturdza's effort to
be heard individually – even on matters that I personally believe are baseless or do
not warrant presentation to the Court."  Finally, Lewin expressed his opinion that
the pressures created by this litigation had affected Sturdza psychologically and
led to her pro se filings, to which Sturdza responded: "[M]y emotional instability,
if any, is caused by the distress inflicted by all the defendants . . . and by the
mystery in which my counsel has deepened me."  Sturdza Aff. (Sept. 21, 2001) ¶
7.

*Id.* at 1293–94 (some citations omitted).

dismissal of her other claims, and certified to the District of Columbia Court of Appeals a

licensing law question relevant to Sturdza's breach of contract and quantum merit claims. *Id.* at

1307.[8]   It is this certification that plays a large role in Sturdza's grievance with Lewin, whom she

holds at least partially responsible for the certification, and the D.C. Circuit.

While being "inclined to agree with the district court that D.C. law precludes Sturdza from

obtaining contractual or quasi-contractual recovery," *Sturdza*, 281 F.3d at 1302, the D.C. Circuit

determined it to be the "wisest course" to certify to the D.C. Court of Appeals the question of

whether an unlicensed architect, under the circumstances presented here, nevertheless would be

able to recover because the D.C. Court of Appeals "has never expressly determined whether the

provision at issue here bars unlicensed architects from enforcing their contracts or recovering in

quantum meruit." *Id.* at 1302–03.[9]

The D.C. Circuit also noted that certification of the licensing law question was appropriate

in light of a statutory exception that had existed:

> [The] D.C. Court of Appeals [has not] considered the implications (if any) of a

---

[8]   Not satisfied with the generally favorable decision of the D.C. Circuit, Sturdza,
acting pro se and against Lewin's advice, petitioned the Supreme Court for a writ of certiorari.
*See Sturdza v. United Arab Emirates,* 537 U.S. 810 (2002) (denying in forma pauperis status);
*Sturdza v. United Arab Emirates*, 537 U.S. 1026 (2002) (denying reconsideration).

[9]   The licensing law question certified to the District of Columbia Court of Appeals
is as follows:

> Under District of Columbia law, is an architect barred from recovering on a
> contract to perform architectural services in the District or in quantum meruit for
> architectural services rendered in the District because the architect began
> negotiating for the contract, entered into the contract, and/or performed such
> services while licensed to practice in another jurisdiction, but not in the District?

*Sturdza*, 281 F.3d at 1303.

statutory exception that permits architects licensed elsewhere to "agree to perform or represent that he or she is able to perform any of the services involved in the practice of architecture . . . until licensed under this act." D.C. CODE § 2-262(6) (1981) (repealed by Second Omnibus Regulatory Reform Amendment Act of 1998 § 1235, 46 D.C. Reg. 3142, 3212).

*Id*. at 1302-03.

The D.C. Circuit further noted that "[a]lthough this exception was repealed since the events at issue here, the basic licensing framework for architects remains unchanged." *Id*. at 1303. Further still, the D.C. Circuit held that these unanswered questions were important because "[the D.C. Circuit] assume[d] that architects throughout the country (perhaps even around the world) unlicensed to practice in the District often submit bids to perform architectural services in this city of embassies, monuments, and public buildings." *Id*.

As for the Guardian ad Litem Motion, the D.C. Circuit remanded the record and the motion to this Court for its disposition. The D.C. Circuit's order of remand stated, "The district court shall make all findings of fact and conclusions of law necessary to resolve the motion in accordance with Federal Rule of Civil Procedure 17(c) and the requirements of due process, *see Neilson v. Colgate- Palmolive Co.*, 199 F.3d 642, 651 (2nd Cir. 1999) (explaining that appointment of a guardian ad litem must comport with procedural due process)." Order, *Sturdza v. United Arab Emirates*, 2002 WL 1285543 (D.C. Cir. June 6, 2002).

**C.   Proceedings Before This Court After First Remand**

*1.   Status Hearing Before this Court*

In order to address the Guardian ad Litem Motion appropriately, this Court first conducted

a status hearing on August 7, 2002.[10]  During the status hearing, the parties in attendance, Lewin,

Sturdza and counsel for Demetriou, were asked to express their views about the "process that is

due and how to proceed[.] [In other words,] [h]ow to go about doing what the Court of Appeals

has [mandated] this court to do."  Tr. of Status Call Before Judge Henry H. Kennedy, Jr. at 17

(Aug. 7, 2002) ("Kennedy Tr.").[11]  In response to the Court's query, Lewin suggested, as a first

step, that Sturdza undergo a mental health examination.  Lewin stated:

> [A]s was true in the Nielsen case which the Court referred to, maybe the first step
> would be to have a mental health specialist appointed by the Court to interview
> Ms. Sturdza[] [in order to] familiarize himself with these matters.  And maybe
> also make a report to the Court initially available to Ms. Sturdza, to me, and the
> other parties in the case, about that psychologist's or psychiatrist's . . . view as to
> whether [Ms. Sturdza] is able rationally to deal with this case.  I think that's the
> issue.  Not whether she should be institutionalized.  Not whether she should be in
> some way declared mentally incompetent.  I'm not making that allegation.  But
> rather, with regard to this case, where I think she has become so
> obsessed with it in various ways that there is nothing that satisfies her. . . .
>
>     [I]f the Court appoints someone to interview Ms. Sturdza, to speak to her
> about the case, to interview me and any other parties who he thinks should be
> interviewed, to look at the materials, to make a recommendation to the Court, then
> I believe we could have a hearing.  I would like to have a hearing.

Kennedy Tr. at 17–18.

---

[10]  This case was randomly assigned to this judicial officer by this Court's Calendar
Committee on June 20, 2002, after Judge Kollar-Kotelly, the district judge initially assigned to
the case, transferred the case to that committee.  The public record does not reveal the reason for
the transfer.  *See* Reassignment of Civil Case (June 20, 2002).  While the public record does not
reveal the reason for the transfer, it *is* a matter of public record that, according to Lewin's co-
counsel, David Shapiro, in a telephone conversation, Sturdza "directly threatened the court,
[Shapiro's] firm and [Shapiro]. [Sturdza] said [she] would 'destroy' and 'burn' [them] if the
court granted Demetriou's fee petition."  Documents Relating to Mot. for Appointment of
Guardian Ad Litem, Vol. 2, Ex. 30 (letter drafted by David T. Shapiro dated Dec. 14, 2001),
attached to Objections to Facciola Report.  It also is a matter of public record that Sturdza in a
"handwritten account" made "strongly worded allegations against [Judge Kollar-Kotelly]."
*Sturdza*, 281 F.3d at 1293.

[11]  Counsel for the UAE did not appear.

10

After hearing from Lewin, this Court addressed Sturdza, and the following colloquy

ensued:

THE COURT:  Ms. Sturdza?  And I suspect that I am pronouncing your last name incorrectly.  How do you pronounce your last name?

MS. STURDZA:  Sturdza.  The "D" is silent.
    Thank, Your Honor.  I am unprepared to speak because I prepared all these all night, but I will try.  One very important point I want to make is that you should have a good feel of how important this project was for me.  This is a, probably by now, a 100 million dollar project on one of the most important sites in Washington, D.C.  It is one of the 24 sites at the International Center where now stands 24 foreign embassies.

THE COURT:  That's off of Van Ness?

THE WITNESS:  Yes.  And what happens once a building is finished, this particular one has a 2 or 300 people capacity in a ballroom.  That means 2 or 300 foreign dignitaries and U.S. dignitaries that are going to receptions almost every night.  There are 24 embassies nearby and each embassy is holding a large reception and everywhere are the most important people from around the world.  So this particular building, once built, brings to its designer everything that a designer wishes in the world.
    If an architect designs a building and it remains on paper, it means zero.  After it's built there are millions of people in a period of five or ten years passing by that building.

THE COURT:  Ms. Sturdza, you indicated that if an architect designs a building and it remains on paper it means zero.

THE WITNESS:  Yes.  I have designed hundreds of buildings and nobody knows.  They are on paper.  They have not been published.  They are not published unless they are built.  You have very, very small publishings in architectural magazines.  Only architects look at them and you don't get exposure.  Exposure is only from a building that has been built successfully.  President Clinton's library, he chose the architect after the building in New York.

THE COURT:  I certainly make the assumption that your case is very, very important to you.  Very, very, very important to you.

THE WITNESS:  Eight years I spent on it.  Eight and more.

11

THE COURT:  I am not asking you to discuss the merits of the case, however, at this time.  What I am interested in doing is figuring out how to resolve the matter which has been sent to me to resolve by the United States Court of Appeals for the D.C. Circuit, which is the motion of Mr. Lewin to have a guardian ad litem appointed to represent your interest in consulting with Mr. Lewin.  I want to know whether there is anything that you wanted to say with respect to that matter.  Mr. Lewin made some suggestions and I ask the same thing of you.

MS. STURDZA:  The motion was filed and I responded within the 10 days, that Rule 27.  I filed an opposition but I found out later that –

THE COURT:  When you say you responded, I assume that you responded in a paper that was filed in the United States Court of Appeals for the D.C. Circuit?

MS. STURDZA:  Yes.  Within the 10-day period after I was served.  But later, just a few days ago, I found out that the Court of Appeals issued the order, without notifying me at all, against the rules of the Court of Appeals procedure.  Rule 27 says that a responses can be made in 10 days after serving.  And if the court wishes to act earlier, then it should give plenty of notice to the parties involved.  I got no notice, not before, not after, nothing at all until today.

     I found out from someone else that that order was sent to you.  And I received notice of this hearing not knowing that it was about the motion.  I thought it was just a hearing on the copyright issue that came back or on my motion for a new trial, because I sent a motion for a new trial.

     And that's another thing.  I filed a motion with the D.C. Court.  I refiled with the D.C. Court and the motion is nowhere to be found.  I called the clerks and expressed my problem and she said that I should bring a copy and she will take it, a stamped copy.  I refiled today a new amended, new motion for a new trial.

THE COURT:  I do have that paper.

MS. STURDZA:  I wanted to file it earlier so you would have time to read it but I just couldn't finish it.  I filed another opposition today.  I filed an opposition to this guardian motion in the Court of Appeals and I filed one today here.  You have it, Your Honor.

THE COURT:  Yes, I do have that.

MS. STURDZA:  There I am saying that the court violated the rules, Rule 27, 3A.  Should have notified me before it acted so I would have time to respond.  And I do think this is just an arrangement.

THE COURT:  This being what?  What is the this that you are referring to?

MS. STURDZA:  The motion for a guardian.

It's an arrangement between Mr. Lewin and the court that he should solve the problems for me.  But on June 11, I filed in the Court of Appeals a motion that I dismissed all my lawyers and I entered an appearance pro se.  I thought that comes to this Court, but I called the clerk and the clerk told me to file another one and I did today and you have that.  So I do expect that anyone in this democratic country can represent herself or himself.  This is my wish and I think I should be able to represent myself.  Now, I have to tell you why, Your Honor.

THE COURT:  Actually, Ms. Sturdza, I think we're kind of moving ahead of things.  Again, what I am attempting to do is to decide how to decide the processes that will be used.  I know that you oppose this.

MS. STURDZA:  I do oppose it strongly.

THE COURT:  And as far as the reasons, we will get to that later.

MS. STURDZA:  May I state my case?

THE COURT:  No.  As far as your case on the merits of whether or not a guardian should be appointed, I will not hear that now.  I scheduled this for a status hearing and frankly, Ms. Sturdza –

MS. STURDZA:  Mr. Lewin is lying all the way and I will never accept a guardian ad litem.

That will never happen.  I have all these proofs.  Mr. Lewin promised me when we met that he will an have appeal de novo and he did not.

THE COURT:  He will have an appeal what?

THE WITNESS:  De novo.

THE COURT:  De novo?

MS. STURDZA:  Yes.  And he did not plead many of the counts.  Let me explain the three major things.  The criminal copyright he did not plead at all.  He said later on, later.  The second is the civil rights discrimination.  He did not plead and I explained it here perfectly.

THE COURT:  Ms. Sturdza, you are now referring to things that you have put on paper.

13

These papers have been filed; is that correct?

THE WITNESS:  Yes.

THE COURT:  All right.  Ms. Sturdza, I will read the papers.  But again, this is simply not the time to address the merits of the motion, the matter that is before me.  What I'm going to do is set this matter for a hearing.  I'm going to set the motion for a hearing and at that time decisions will be made, or after the hearing the Court will make a decision.
        The thing to do now, however, is to set the matter for a hearing.  I heard Mr. Lewin suggest that prior to any further proceedings, including the hearing, that you be examined by a physician.

THE WITNESS:  I oppose that and I will never be examined as Mr. Lewin is saying.  I do not accept and this will never happen.  Mr. Lewin is not my lawyer, Your Honor.  This is past and Mr. Lewin is not my lawyer.

THE COURT:  Ms. Sturdza, I hope you understand my role.

MS. STURDZA:  My mother was going to die because of her physician and I am not going talk to whoever that is.

THE COURT:  Ms. Sturdza, I only indicated what Mr. Lewin said.  I did not indicate that the Court would order a physician to examine you.  Frankly, I have heard the request and I have not made any decisions in that regard.  I only indicated what he had said.  I do know that you oppose that as well.

Kennedy Tr. at 22–30.

At this point in the proceedings, the Court discussed with counsel and with Sturdza possible dates for a hearing on the Guardian ad Litem Motion and explained the difficulty of selecting an agreeable date in the near term because this Court is required to give priority to criminal cases on its docket.  Thereafter, a hearing was scheduled for September 5, 2002, at 10:00 a.m.  After the hearing was scheduled, however, Ms. Sturdza continued to express her views:

MS. STURDZA:  Your Honor, I need to respond to Mr. Lewin at least.  Mr. Lewin accused me of stopping him from sending the question to the Court of Appeals.  That question is about a D.C. license.  This embassy is built in the

14

International Center which is a development of 24 embassies.  Congress made a special law for those 24 embassies.  The National Capital Planning Committee made the rules of how to build the buildings instead of the D.C. rules and regulations of zoning.  And Congress said, in Public Law 90 and as modified at the 97th Congress, said that NCPC development controls replaces the D.C. zoning regulations.

An architect needs a license for D.C. only to comply with the D.C. zoning. This building is in the International Center and does not have anything to do with that.  And they did this law especially for the foreign embassies.  They encouraged all these countries to have buildings designed in their architectural heritage, in their culture.

THE COURT:  Ms. Sturdza –

MS. STURDZA:  I need to finish.  I'm sorry.

THE COURT:  I'm also sorry, Ms. Sturdza.  But I simply am not going to hear you at this point on why it is that you, as I understand it, forbad[e] Mr. Lewin from filing the brief.  You're telling me why you did that.

MS. STURDZA:  A D.C. license is not necessary, period.  There is no law. Nobody requires it.  No one asked for it.  Nobody.  This is just a fabrication of Mr. Lewin.  He fabricates things.  It is all a fabrication.

THE COURT:  I understand that that's what you have said in your papers.

MS. STURDZA:  I said that before and no one listens.  The Court of Appeals told me not to file any more and Mr. Lewin threatened me and David Shapiro threatened me that they will dismiss my appeal if I say something.  And in one full year I had two meetings with my counsel.

THE COURT:  Ms. Sturdza, I have to conclude this proceeding now.

MS. STURDZA:  One more thing.

THE COURT:  One more thing?  How long?

MS. STURDZA:  It's short.  I wrote two letters to Mr. Lewin and asked him why he did what he did.  He never answered.  His answer is a guardian.  He hides behind a guardian his criminal acts against my case.  He is sabotaging the case. He probably made an arrangement with the defendants to settle.

THE COURT:  I'm going to stop you there.  What you should expect to receive, Ms. Sturdza, Mr. Lewin and Mr. King, is something from me explaining the

process that will be used.  I know that I said a hearing.  This is a rather unusual thing and I will try to give some more directive than that.  The record is clear.  What has been said here is clear and I will have to make some decisions about how to proceed.

MR. LEWIN:  One question, Your Honor, in that regard.  If it is necessary for us to subpoena any witnesses, Mr. Shapiro has been cooperative but I know his firm's feeling is that they would like to stay as far away from this controversy as possible.  So will this be an evidentiary hearing so that if I have to get witnesses I could issue subpoenas?

THE COURT:  I envision this to be the final hearing and that's that.  Let me say this.  As certainly counsel knows, there are vehicles to be used when the Court is able, or at least one side believes that the Court is able to make a ruling as a matter of law because of undisputed facts.  Perhaps that is something that might be considered as well.  That is, to file whatever papers, affidavits that are needed that would ask the Court to rule as a matter of law based upon certain undisputed facts.  That's another way of proceeding.

I don't want to simply say I will take this matter under advisement.  I know how I work and when there is something in court that gets my attention, and that's why I'm setting this matter in court.  But it seems to me that might be a way of going about this as well.  That's about as much direction as I can give at this point.

MS. STURDZA:  May I ask a question?

THE COURT:  Let me say this Mr. Lewin, Ms. Sturdza, and Mr. King.  When I actually consider what has been said here, I might even order that.  I don't know.  But that's where I am.

MS. STURDZA:  Your Honor, for four years my case was in court and I was forbidden by the court not to ask one question for discovery.  I had zero discovery in four years.  Discovery was open for one year.  I produced three sets of interrogatory answers and two times production of documents.  Judge Kotelly, that's why I am complaining, told me I cannot serve.  I simply cannot serve.  I think this was very, very wrong.

THE COURT:  Ms. Sturdza, let me say this.  As we speak, you are represented by Mr. Lewin.  And in the civil justice system, we have a representative system, it is the attorney who has the obligation and right to seek discovery.  Therefore, if you as representing yourself sought discovery, I can imagine that the Judge said you can't do that.  But I don't know any of that and, frankly, it is of no moment at this time.

And Ms. Sturdza, I am going to have to conclude this status hearing and I

16

must do so right now.  You have another date.  As I indicated, I do anticipate filing something.  What you should do is write down for me your address because I will be inclined to send papers to [you] personally as well as to Mr. Lewin and counsel for the defendants.  And counsel, by the way, I do recognize that one of the parties is not present.  I heard that.  So please write down your address and give it to Ms. Nathan, the clerk.

MS. STURDZA:  She has it on all the pleadings.

THE COURT:  Okay.  Good day.

MS. STURDZA:  Thank you very much.  And I'm sorry about four years of no discovery at all.

It doesn't look like we are in the United States.  It looks like somebody in Russia during the Stalinist regime.

THE COURT:  Good day, Ms. Sturdza.

Kennedy Tr. at 32–38.

> 2.      *Motion Hearing Before Magistrate Judge Facciola and His Report and Recommendation*

For reasons that do not appear on the public record, this Court cancelled the September 5, 2002 hearing and referred the Guardian ad Litem Motion to United States Magistrate Judge John M. Facciola for a hearing and recommendation, pursuant to Rule 72.3 of the Rules of the United States District Court for the District of Columbia.[12]

---

[12]   The order of referral to Magistrate Judge Facciola states:

**ORDER REFERRING MOTION TO UNITED STATES MAGISTRATE JUDGE JOHN FACCIOLA**

It is this 6th day of August, 2002, hereby

**ORDERED** that the motion of counsel for plaintiff seeking appointment of a guardian ad litem to consult with counsel and to determine on behalf of Ms. Sturdza the actions to be taken in this case, a motion filed in the United States Court of Appeals and remanded, on June 6, 2002, to the District Court for decision, is hereby referred to United States Magistrate Judge John Facciola for his Hearing and Recommendation pursuant to LCvR 72.3; and it is further

**ORDERED** that the hearing on this motion scheduled for September 5,

17

The magistrate judge noticed the motion for a hearing,[13] which was held on October 9, 2002, and was attended by Lewin, Sturdza and counsel for the UAE and Demetriou, each of whom expressed their positions regarding the Guardian ad Litem Motion.  *See* Tr. of Mots. Hr'g Before U.S. Mag. J. John M. Facciola (Oct. 9, 2002) ("Facciola Tr.").

Early in the hearing, the magistrate judge addressed the issue of whether Sturdza should be able to represent herself since, ostensibly, she had "fired" Lewin.  Lewin responded as follows:

> Well, subsequent to the time that I filed the motion [for a guardian ad litem], Ms. Sturdza, who I had really told during the entire course of the appeal that she was free to dismiss me at that point, at any point prior to the time that I had filed the first brief and then the reply brief and then the argument, she did not choose to do so.  After I filed this motion, she said to me, in June, "You're dismissed, and give me back my files."  I think that's part of the course of conduct, quite frankly, that is not in her interest and it followed the filing of my motion.
>
> Therefore, I have not – although I have not since that time, frankly, communicated with her as her attorney or in any other way, to my recollection, I would ask the Court – and I will expound on this, I guess, during the course of the

---

2002, is cancelled.

Henry H. Kennedy, Jr.
United States District Judge

Order Referring Mot. to U.S. Mag. J. John M. Facciola (Aug. 6, 2002) [#140].

[13]  Magistrate Judge Facciola's hearing notice states:

**ORDER**

It is hereby,

**ORDERED** that the parties appear before me on October 9, 2002, at 2:00 p.m. for a hearing on plaintiff's <u>Petition to Appoint a Guardian Ad Litem</u>.

**SO ORDERED.**

JOHN M. FACCIOLA
UNITED STATES
MAGISTRATE JUDGE

Order (Aug. 28, 2002) [#144].

hearing today – to appoint a guardian who can make a decision as to whether to
fire me.  If the guardian decides to fire me, I'm fired.  If the guardian decides not
to fire me, then I would think the guardian, being a Guardian Ad Litem for
purposes of this case, could decide that I would best represent her interests in this
case.

*Id.* at 5–6.

The magistrate judge also asked Lewin to respond to the argument of counsel for the

UAE and Demetriou that "if [Lewin] ha[d] been fired [he had] . . . no standing whatsoever to

seek any relief from the Court." *Id*. at 6.  Lewin answered as follows:

Well, because I filed the [Guardian ad Litem Motion] pursuant to Rule
1.14 of the District of Columbia Rules of Professional Conduct, which state[s]
that "[w]hen a client's ability to make adequately considered decisions in
connection with a representation is impaired, whether because of minority, mental
disability, or for some other reason, the lawyer shall, as far as reasonably possible,
maintain a normal client relationship with the client," and then it goes on to say,
"A lawyer may seek the appointment of a guardian or take other protection action
with respect to a client only when the lawyer reasonably believes that the client
cannot adequately act in the client's own interest."

It was pursuant to that rule that I filed my motion – as her lawyer.  Because
I believed that Ms. Sturdza could no longer act in her own interest.  The steps that
she took, quite frankly I think in retaliation for my having filed that motion, were,
I think, not in her own interest.  Therefore, I believe I have standing as of the time
I filed the motion and I continue to have it, notwithstanding the actions she took
after that time.

*Id.* at 6–7.

Lewin proposed that a "complete record" be made of his motion and that he "testify

today[] . . . regarding the reasons for my conclusion that Ms. Sturdza is, as the Rule states, not

able to act in her own interest, and therefore requires a Guardian Ad Litem in order to

successfully prosecute this case." *Id*. at 7.  The magistrate judge responded to Lewin's proposal

by asking, "[i]f she is mentally disabled under that rule, how is she capable of representing her

own interests at this hearing?  Am I obliged to appoint a Guardian Ad Litem for the limited

19

purpose of representing Ms. Sturdza's interests in your application to get her appointed a

Guardian Ad Litem?"  *Id.* at 8.  To this Lewin responded:

> Well, Your Honor, I think that to the extent that Ms. Sturdza says that she
> does not need a Guardian Ad Litem, she is able to represent her interests in this
> proceeding.  She has apparently been filing papers.  I'd be prepared to be cross-
> examined by her.  She can ask me any questions – I take the witness stand, I
> testify about this.  She can ask me any questions and Your Honor will then make
> a decision based on the record.
>
> If, during the course of the proceeding there comes a time when Your
> Honor thinks that she is not able rationally to present that side of the case, I guess
> Your Honor might say, "Look, I have to call a halt to these proceedings and
> appoint an attorney for her who will present this."
>
> But in the absence of that, she's protesting that she is able to proceed.
> And I think one of the ways of Your Honor finding out whether she is, maybe, is
> allowing her to proceed in this very hearing.

*Id.* at 8–9.

When the attorneys for the UAE and Demetriou were asked for their position regarding

Lewin's motion, they framed the question to be decided as whether "[Sturdza is] competent to

dismiss her attorney.  Because if she is, anything filed by the attorney, especially since she has

filed an opposition to the [Guardian ad Litem Motion], has been withdrawn. And she has a

constitutional right to represent herself pro se."  *Id.* at 9.  Counsel for Demetriou also expressed

the view that in light of "a doubt as to competency I think much more formal proceedings should

be had and [Sturdza's] interest should be looked into in this proceeding."  *Id.* at 12.

Later in the hearing, Lewin alluded to the suggestion he had made during the August 7,

2002 status hearing that a psychiatrist or psychologist examine Sturdza.  *Id.* at 15–16; *see*

Kennedy Tr. at 17.  Lewin explained that he had "inquired of professionals in the field whether

they would be prepared to testify [regarding whether Sturdza is mentally ill]. . . . [S]everal of them

said that it was unethical for them to do so without an examination[.]"  Facciola Tr. at 16.

Lastly, after hearing from the attorneys, the magistrate judge heard from Sturdza.  It is apparent that Sturdza understood that it was her turn to express her position regarding the Guardian ad Litem Motion, and she made her case, as the following colloquy demonstrates:

MS. STURDZA:  Your Honor, I think things are going out of control in this court. And I think that once [again] Mr. Lewin is lying and fabricating words and put them in my mouth and changing the subject.  The subject was that he sabotaged my case, and I made the state – I made the case in all those papers that have previously been filed, and I wrote him two letters and I asked him to answer to each of the acts that he did.  He never answered.  He never answered.  There are six month since I asked him to specifically explain his acts.

He filed a totally misleading brief, full of lies.  There are laws made by Congress that specifically says that an architect does not need a license in that international center.  And Mr. Lewin is sending a question to be certified about –

THE MAGISTRATE JUDGE:  Wait, wait a minute.

MS. STURDZA:  – the D.C. license.  That is a fabrication just to get rid of some counts so he will come to a verdict that will be pleaseful to Mr. Kalbian.  And it is an arrangement between my lawyer and United Arab Emirates and the Demetrio[u] to dismiss all the counts but one.

They tried at the beginning to dismiss everything but didn't work.  They thought I am a stupid and I won't understand it.  And now the question is in his part, Mr. Lewin must answer to my letters line by line and to that amended motion for a new trial, where I explain his wrongdoings.  He is sabotaging my case and he must answer and explain.

I made the state, I listed and I spent enormous amount of time doing work of a lawyer without any experience whatsoever.  I have zero experience in law. And I am not an English language speaker.  I am a Romanian speaker.  And I have learned English in this county and I have learned it in architectural field and not in law.  So I have to study, to study the vocabulary, to learn the words, and then to read the laws to understand the laws.  Shame on Mr. Lewin, that he has done that to me.  And I asked him to correct the brief.  The brief was full of misleading statements and of big lies.  And you are telling me now that I am –

THE MAGISTRATE JUDGE:  Ms. Sturdza, you know you won in the Court of Appeals.

MS. STURDZA:  Excuse me?

THE MAGISTRATE JUDGE:  You won in the Court of Appeals.  You won.

MS. STURDZA:  I won the copyright, and the others were waiting to be dismissed.

THE MAGISTRATE JUDGE:  Yes, and the contract has gone –

MS. STURDZA:  And that question –

THE MAGISTRATE JUDGE:   – to the Court of Appeals of the District of Columbia.

MS. STURDZA:  I won, but where is, where is – it's on hold.  Why is it on hold?  Why?  Why is –

THE MAGISTRATE JUDGE:  Because there are, first of all –

MS. STURDZA:  – it on hold?  Why is it back here?

THE MAGISTRATE JUDGE:  The D.C. –

MS. STURDZA:  Why isn't it back here?

THE MAGISTRATE JUDGE:  The D.C. Court of Appeals –

MS. STURDZA:  Why I did not have any discovery?  I was prevented from asking any question whatsoever.  I had zero words on discovery, and I was forced by Judge Kotelly, I was forced several times by Kotelly with my previous lawyer, Covington and Burling, to answer three times to interrogatories and twice to production of documents.  And when Ron Dofe (phonetic) asked Judge Kotelly to serve questions on my part, she said no.  The discovery session was open.  Why did she say no?  Can you answer that?

THE MAGISTRATE JUDGE:  No, I don't.  But it's not my province to give you a lecture on what another Judge did.

MS. STURDZA:  Well, it's a problem of this Court, this Court is sympathizing too much with United Arab Emirates.  United Arab Emirates is a friend of this county.  But they should not steal from us.  They are stealing.  And they should not steal, and this county should not let them steal.  They are going behind the doors and are stealing from us.  This project is one of the best architectural designs in the world, and I produced it and I won over the three top – the three largest firms in the world, and my design was better than theirs.  And they did not let me finish.  They stole it before I could finish.  And I could have done it even better because that was only a schematic design.  And this Court and the Court of Appeals has interfered with the process of design instead of following the rule of

the Constitution to protect the progress of the arts and science, these Courts have stopped the progress for four years.

THE MAGISTRATE JUDGE:  Okay.  Thank you, Ms. Sturdza.

MS. STURDZA:  And I am going to file [a] complaint because what you are doing is not correct, and what Mr. Lewin is doing is not correct, and I will – I am not forced to talk to anyone until Mr. Lewin answers the questions.

THE MAGISTRATE JUDGE:  So I take it, then, Ms. Sturdza, that as you told Judge Kennedy –

MS. STURDZA:  I –

THE MAGISTRATE JUDGE:  If you please let me finish the sentence – you understand me?

MS. STURDZA:  Yeah.

THE MAGISTRATE JUDGE:  You're in a courthouse now, and in a courtroom.

MS. STURDZA:  Yes, Your Honor.

THE MAGISTRATE JUDGE:  The only thing I ask is courtesy.

MS. STURDZA:  But is –

THE MAGISTRATE JUDGE:  I show it and I demand it in return.  Okay?  I just have to ask you this question.

You've already told Judge Kennedy, but I have to ask you again.  Would you agree to submit to a comprehensive mental health examination by a physician?

MS. STURDZA:  No, because I am not – I am very capable and I am running a family and I am the chief of the family and I am doing all the paperwork, I do all the taxes, I am my husband's accountant, and I'm doing the taxes for him, for me, and for my children, and I have two old children and I have taken care of them and I recently – Mr. Lewin has caused me a lot of trouble for the past year, and I had to spend all my time learning to become a lawyer, and Mr. Kalbian and Demetrio[u]'s attorney also they know I won, they know they have stolen my design, and –

THE MAGISTRATE JUDGE:  Have you sued Mr. Lewin in another lawsuit?

23

MS. STURDZA:  Yes.  Yes.  On August 20.  And is waiting because of this lawsuit and because I am spending all my time –

THE MAGISTRATE JUDGE:  So you've sued –

MS. STURDZA:   – on, on this, and I'm not doing architectural work.  I have to spend all my finances on this case.  I became in a poverty level.  And I filed for informal _____ and Judge Kennedy is holding for more than six weeks that lawsuit from being filed, and it is there waiting to be filed, waiting for the approval of my poverty statement, and I told them everything and they're just sitting on it.  And –

THE MAGISTRATE JUDGE:  So I take it, then, as far as you're concerned, Ms. Sturdza, you have fired Mr. Lewin.

MS. STURDZA:  Yes.

THE MAGISTRATE JUDGE:  And you're representing yourself.

MS. STURDZA:  Yes.  I am representing myself, and Mr. Lewin does not know what my best interest is.  And no one knows until I [make a statement] to a jury.  I have asked, in '98, for a jury trial, and without a jury this will not conclude.  And right now it is in the – I don't know, probably you know, that I filed a stay because my case is in the Supreme Court, and the Supreme Court has to rule on it yet.  They have not ruled.

THE MAGISTRATE JUDGE:  Thank you, Ms. Sturdza.

MS. STURDZA:  And the Court of Appeals actually violated the rules of this Court by issuing the order through which we are sitting now today.  That was on June 6.  I think it was all a fake order made retroactively after I fired my attorney.  On June 11, I fired my attorney, and I came to the Court and nothing was filed on June 6.

Later on appealed that, and I found out a month later, because my attorney, he was saying that he was still my attorney then, never notified me of that letter, of that order.  And the Court did not notify me.  Only I found out a month later that the Court ordered this case – this session.  And it was in violation with the law.

So this, today's session should not have existed.

THE MAGISTRATE JUDGE:  Well, it did.  Thank you, Ms. Sturdza.

MS. STURDZA:  It did, and too bad.

THE MAGISTRATE JUDGE:  So be it.

Facciola Tr. at 17–24.

After briefly hearing Lewin further regarding the lawsuit that Sturdza suggested she had filed against Lewin and her application to proceed in forma pauperis in connection with her pro se-filed petition for a writ of certiorari to the United States Supreme Court, the magistrate judge took the Guardian ad Litem Motion under advisement.  The magistrate judge said:

> All right, thank you.  I'm going to take the matter under advisement, and I'm going to focus – take this in the smallest bites of which I am capable of cutting it in, I'm going to focus, first of all, on the question as to whether or not I should appoint a Guardian Ad Litem for the limited purpose of representing Ms. Sturdza's interests in a hearing to be held as to whether she had the competency to fire Mr. Lewin.  I'm not certain that that's how I'm going to shape the issue, but that's my tentative thinking.  I'm going to issue an order and a memorandum after I've had a chance to give this some thought.
>
> I also believe that it reached the point I may try to find someone who will function as amicus curiae to represent the Court's own interests in the just resolution of this matter.  And I think that is the way I will proceed.  I'm being tentative because I haven't yet made up my mind exactly what to do, because the situation is so unusual.  But I think I shall proceed in that fashion, and that we will not go forward with the evidentiary hearing today.  But I plan to resolve that, probably within the next week or ten days, and you'll get an order from me and it'll rule from that point on.
>
> Thank you.
>
> (Whereupon, proceedings were concluded.)

Facciola Tr. at 25–26.

The magistrate judge issued a Report and Recommendation on January 9, 2003, recommending that Lewin's motion for the appointment of a guardian for Sturdza be denied. *Sturdza*, 2003 WL 102991.  The Report and Recommendation addressed the interplay between 28 U.S.C. § 1654, which provides that "[i]n all courts of the United States the parties may plead and conduct their own cases personally or by counsel . . . ," and Rule 17(c) of the Federal Rules of Civil Procedure, which requires the court to "appoint a guardian ad litem – or issue another

25

appropriate order – to protect a[n] . . . incompetent person who is unrepresented in an action."
*Id*. at *2; *see also* 18 U.S.C. § 1654 & Fed. R. Civ. P. 17(c).  Observing that a litigant's statutory

right of self-representation has "ancient lineage," the magistrate judge was wary of giving the

term "incompetent," as used in Rule 17(c), too broad a definition because doing so "may deprive

a person of a fundamental right without adequate justification." *Sturdza*, 2003 WL 102991, at

*2.  To forestall such a result, the magistrate judge determined that "a principled analysis of the

meaning of the word 'incompetent' require[d] a careful analysis" that weighed the consequences

of an appointment of a guardian on Sturdza's statutorily protected right to control her suit against

"the [legitimate] interests advanced in support of that deprivation," including Lewin's financial

interest.  *Id.* at *2-4.  The magistrate judge determined that such an "analysis requires a much

greater showing than has been made by Lewin that Sturdza is 'incompetent' as that word in Rule

17(c) is defined." *Id*. at *2.

Further, while ostensibly not central to his recommendation, the magistrate judge was

"deeply concern[ed]" that Lewin opted to file a motion for the appointment of a guardian rather

than employ either the statutory system in place in the District of Columbia or its counterpart in

Maryland, where Sturdza resides, that governs circumstances under which a guardian ad litem

can be appointed for an "incapacitated individual."  *Id*. at *4 & n.3; *see* D.C. Code Ann. §§ 21-

2001 to 2077; Md. Code Ann. Est. & Trusts § 13-201(c)(1).  Characterizing Lewin's motion as a

"remarkable 'end run' around [these] statute[s] and the procedural protections [they] provide[],"

the magistrate judge expressed the view that he "[could not] possibly describe this intelligent,

albeit demanding, woman as incapacitated in the sense that I would not trust her with a

checkbook or fear for her safety or health if a guardian was not appointed." *Sturdza*, 2003 WL

102991, at *4.  Accordingly, the magistrate judge recommended against the appointment of a
guardian for Sturdza.  *Id.* at *5.

       3.     *Proceedings in this Court Following the Magistrate Judge's Report and Recommendation*

       Lewin filed objections to the magistrate judge's Report and Recommendation, *see*
Movant's Objections to the Magistrate Judge's Report and Recommendation (Jan. 23, 2003)
[#158] ("Objections to Facciola Report"), and Sturdza filed a reply to Lewin's objections, *see*
Reply to Movant's Objections to the Magistrate Judge's Report and Recommendation (Feb. 4,
2003) ("Reply to Objections") [#160].[14]  Lewin had two primary objections to the merits of the
Report and Recommendation.  First, Lewin objected to the weight the magistrate judge gave to
Lewin's financial interest in weighing the competing interests that were considered by the
magistrate judge in arriving at his recommendation.  Because the magistrate judge did not
properly weigh his financial interest, Lewin argued, the magistrate judge erroneously concluded
that Lewin's financial interest was "easily trumped" by Sturdza's right to represent herself.
Objections to Facciola Report at 4. Lewin asserted that the magistrate judge erred in not
appreciating that a citizen's decision to represent herself is itself driven by financial interest:
"[t]he ultimate goal being sought by the citizen who represents himself or herself in a civil action
that seek[s] only damages – as this lawsuit now does – is the 'financial' goal of recovering
compensation."  *Id.*  Therefore, according to Lewin, when viewed from a proper perspective,

---

      [14]  Lewin's objections were set forth in an eight-page memorandum.  Attached to the
memorandum was a transcript of the October 2002 hearing before Magistrate Judge Facciola and
two volumes of sixty-two exhibits.  The exhibits spanned 436 pages, not including the five-page
table of contents.  *See* Objections to Facciola Report.
      Sturdza's reply to Lewin's objections was set forth in a six-page memorandum that was
accompanied by thirteen exhibits spanning seventy-one pages.

"[t]he 'financial' objective of the client does not . . . 'easily trump' the 'financial' objective of the attorney to be compensated for services that have been effectively and productively performed." *Id.* at 4.[15]

Second, Lewin asserted that the magistrate judge erred by equating, in effect, "the plaintiff who begins and pursues his or her case *pro se* and the plaintiff who, by a promise of a contingency fee, succeeds in persuading an attorney to perform substantial services and then decides, whether rationally or not, to dismiss the lawyer."  *Id.* at 5.  Under the circumstances, Lewin maintained that he has a legal right to continue with his representation of Sturdza.  *Id.* Consequently:

> Just as a client can sue a lawyer for malpractice if the lawyer mishandles the case, the lawyer who is entitled to a share of a recovery should have an enforceable right to see to it that the case, in which he has an interest, is not destroyed by the inability of the client to make rational judgments regarding the litigation.

*Id.*

Sturdza's reply to Lewin's objections did not meet them on their merits.  Rather, Sturdza's reply brief began by  "respectfully inform[ing] the Court that Mr. Lewin is trying again to mislead the Court."  Reply to Objections at 1.  She then made the following points :

THE FACTS

. . .

**2. Mr. Lewin is continuously lying in pleadings and in sworn Affidavits. . . .**

---

[15]   Lewin also pointed out that the case authority cited by the magistrate judge in reference to the "ancient lineage" of 28 U.S.C. § 1654 involved the right of a defendant in a *criminal* case to represent himself, *see United States v. Dougherty*, 473 F.2d 1113 (D.C. Cir. 1972), a right that in the criminal context is constitutionally protected.  Objections to Facciola Report at 4; *see Faretta v. California,* 422 U.S. 806 (1975); *O'Reilly v. New York Times Co.*, 692 F.2d 863, 867 (2nd Cir. 1982).

**No Settlement Discussions between the Thieves and the Saboteur**

When Plaintiff Sturdza begun suspecting that Mr. Lewin is sabotaging her case, she gave him a chance to explain his actions repeatedly during several months, and when he **failed** to answer she concluded that **Mr. Lewin was acting against her interests.**

### The Question on DC Licensing
### Should Not Have Been Sent for Certification

### No need for Brief

Mr. Lewin's complaint that the plaintiff has prevented him from filing a brief in the District of Columbia Court of Appeals is just the proof of his acting against his client's wish.  The subject of that brief does not relate to Plaintiff Sturdza's case. Congress made a Law for the land at the International Center and asked the National Capital Planning Commission to create zoning regulations for the development at the International Center in lieu of the DC zoning regulations for which DC license is required. . . .

**Plaintiff Proved Counsel's Brief Misled the Court of Appeals**

Plaintiff Sturdza researched the applicable laws and proved in her pleadings that Mr. Lewin filed a misleading Brief and mislead [sic] the Court in the oral argument. . . .

**Movant Tries to Mislead the District Court**

Mr. Lewin lied to the Court of Appeals when [sic] said that "He advised the Court of Appeals of the claims that she insisted she wanted to make and that counsel had thought inappropriate and had therefore not presented in the appellant's briefs." . . .

ARGUMENT

I
COUNSEL OBTAINED A REVERSAL OF ONE COUNT ONLY

Mr. Lewin had to plead in a **review de novo** of the case. Before he took the case he **promised** [he] would do everything the law permits but in his brief he plead only for one count out of the nine. . . .

**Taking Credit for Her Own Design May Make Her World Famous**

29

Pro se plaintiff does not have only a financial interest as Mr. Lewin mistakenly pretends. Becoming world famous architect is a non-measurable reward.

**A saboteur Must Not Be Rewarded**

Mr. Lewin has worked hard to secure the dismissal of eight counts and wants to be rewarded for it by the one to whom he caused damages.

II
LAWSUIT RUINED PLAINTIFF'S LIFE
BUT HAS NOT DRIVEN HER TO AN IRRATIONAL STATE
. . .

III
ONLY THE PLAINTIFF KNOWS HER INTERESTS
. . .

Reply to Objections at 2–5 (emphasis reproduced as supplied in Sturdza's brief).

After reviewing the magistrate judge's Report and Recommendation and Lewin's and Sturdza's objections to it, this Court declined to accept the magistrate judge's recommendation and determined that "further fact finding is warranted."  Order to Show Cause at 3 (Apr. 24, 2003) [#161].  Also, "find[ing] that Ms. Sturdza's ability to adequately protect her interests in the instant litigation is subject to question," she was ordered to "**SHOW CAUSE** as to why she should not be ordered to undergo a mental examination by a licensed psychiatrist, who will be asked to render an opinion concerning the matter at hand."  *Id.* at 4.

Sturdza refused to appear for the show cause hearing, convened on June 4, 2003, and refused to appear again when, because of her absence on June 4, 2003, the show cause hearing was rescheduled to convene on June 23, 2003.  Thereafter, on August 26, 2003, Sturdza was ordered to submit to a mental examination by a licensed psychiatrist for the following reasons:

Because Ms. Sturdza has failed to show cause as to why she should not be ordered to undergo a mental health examination, despite two opportunities to do so, and

30

> because the court is confirmed in its view that a psychiatric evaluation is needed
> in order to properly resolve Movant Lewin's motion for the appointment of a
> guardian ad litem . . . .

Mem. Op. and Order at 6 (Aug. 26, 2003) [#170].  This Court's order also required Lewin and

Sturdza each to submit the names of two licensed psychiatrists whom they would propose to

perform the examination.  Lewin responded with two names, but Sturdza ignored the Court's

order.

On September 28, 2005, this Court granted the Guardian ad Litem Motion and set forth

its rationale for doing so.  The crux of the rationale was as follows:

> The court does not believe that [Sturdza] is capable of making responsible
> decisions concerning this pending litigation.  In arriving at this conclusion, the
> court relies on its first-hand observation of Ms. Sturdza's behavior during the July
> 10, 2002 status conference; its consideration of the voluminous exhibits submitted
> by Mr. Lewin in support of his motion, among them Ms. Sturdza's *pro se*
> pleadings filed in direct contravention of a Court of Appeal's order; the court's
> review of the transcript of the October 9, 2002 hearing before Magistrate Judge
> Facciola; and Ms. Sturdza's failure to comply with this court's prior orders –
> specifically the order requiring her attendance at the June 4th and June 23rd
> hearings, and the August 26th order asking her to identify two psychiatrists and
> submit to a psychiatric evaluation.  Taken together, these sources indicate that Ms.
> Sturdza is incapable of rational decision-making with respect to the instant case.
>
> The court has not arrived at this decision lightly and is acutely aware of the
> effect this decision will have on Ms. Sturdza.  As Magistrate Judge Facciola
> discussed in his report and recommendation, the appointment of a guardian ad
> litem will usurp Ms. Sturdza's control over the direction of this litigation.  *See
> Sturdza v. United Arab Emirates*, 2003 WL 102991, at *2–*3 (D.D.C. Jan. 9,
> 2003) (report & recommendation).  That being said, granting Ms. Sturdza
> complete autonomy with respect to her case will significantly jeopardize the
> effective and efficient prosecution of her claims.  Ms. Sturdza has demonstrated
> that she is unwilling to comply with the directives of this, and other courts; she
> has refused to adopt counsel's sound advice, and nearly every individual
> associated with this litigation has been the subject of her vitriolic attacks.
>
> Ms. Sturdza will not submit to a psychiatric evaluation, and the court can
> think of no additional procedural safeguards that would assist in its decision to
> appoint a guardian ad litem.  Ms. Sturdza has been provided ample opportunity to
> contest movant Lewin's application; plaintiff was granted a hearing by Magistrate
> Judge Facciola, and has twice been ordered to appear before this court to address

the instant motion.  That she has declined to appear at the hearings before this court is unfortunate, but not dispositive.

> The court believes that the record, in addition to the court's observation of Ms. Sturdza's behavior during the July 10, 2002 status conference, provides an adequate basis to conclude that plaintiff is incompetent for purposes of Fed. R. Civ. P. 17(c).  Viewed as a whole, the record demonstrates that Ms. Sturdza is prone to paranoid outbursts and has expressed irrational hostility towards Mr. Lewin and this court.  Furthermore, plaintiff has shown that she lacks the capacity to understand the legal proceedings associated with her case. . . .

> Examining the totality of the circumstances, the court is satisfied that plaintiff has been provided due process, and the appointment of a guardian ad litem is necessary.  *See Morrissey v. Brewer*, 408 U.S. 471, 481 (1972) ("[D]ue process is flexible and calls for such procedural protections as the particular situation demands.").

Mem. Op. and Order at 4-7 (Sept. 28, 2005) [#173] (footnotes omitted).

In addition to addressing the "facts," such as they are, this Court addressed the "law."

This Court stated:

> The court looks to the law of plaintiff's domicile, Maryland, for guidance in determining whether she is "incompetent" and therefore in need of a guardian ad litem.  *See Thomas*, 916 F.2d at 1035 ("[I]n the context of someone seeking to pursue litigation in federal court on his own behalf, we interpret the term "incompetent person" in Rule 17(c) to refer to a person without the capacity to litigate under the law of his state of domicile and, hence, under Rule 17(b)."). Maryland law states that a guardian shall be appointed if  "[a] person lacks sufficient understanding or capacity to make or communicate responsible decisions concerning his person, including provisions for health care, food, clothing, or shelter, because of any mental disability, disease, habitual drunkenness, or addiction to drugs. . . ."  Md. Code Ann., Est. & Trusts, § 13-705 (2003), *see also* Md. R. of Ct. 10-201.

*Id.* at 5 n.5.

Finally, on March 27, 2006, this Court appointed attorney Martin Baach as Sturdza's guardian, indicating that Baach would "consult with counsel and determine how to prosecute this case in [Sturdza's] best interests, including, for example, determining how to proceed with the matter currently before the District of Columbia Court of Appeals, and making any

32

determinations concerning settlement of the case."  Order at 1–2 (Mar. 27, 2006) [#179] (footnote omitted).

**D.      The D.C. Circuit's Review of this Court's Appointment Decision**

Upon appellate review of this Court's decision sought by Sturdza and Demetriou, the D.C. Circuit vacated this Court's appointment in a brief per curiam opinion[16] finding that Sturdza was not afforded due process of law.  *See Sturdza*, 562 F.3d 1186.  The D.C. Circuit explained that because a "'litigant possesses liberty interests in avoiding the stigma of being found incompetent, and in retaining personal control over litigation, the Due Process Clause of the Fifth Amendment limits the district court's discretion with respect to the procedures used before appointing a guardian ad litem.'"  *Id.* at 1188 (quoting *Neilson*, 199 F.3d at 651).  Thus, "[w]hen the party for whom the guardian is sought claims to be competent, at least 'some hearing' is required."  *Sturdza*, 562 F.3d at 1188 (citation omitted).  And, "[a]lthough this need not always take the form of a 'full adversary hearing,' at a minimum it entails 'notice and an opportunity to be heard.'"  *Id.* (citation omitted).

The D.C. Circuit determined that this Court did not give Sturdza notice and an opportunity to be heard "as there was no proceeding that she was told would be her opportunity to convince the court that appointment of a guardian was unnecessary."  *Id.* at 1189.  According to the D.C. Circuit, neither the July 10, 2002, status conference nor the October 9, 2002, proceeding conducted by Magistrate Judge Facciola addressed the question whether to appoint a guardian.

---

[16]  The D.C. Circuit generally employs the term "per curiam" for cases of lesser significance.  *See Buckley v. Valeo*, 519 F.2d 821, 835 (D.C. Cir. 1975) ("This opinion is per curiam.  That term is conventionally reserved for cases of lesser significance.").

The July 10, 2002, status conference, the D.C. Circuit reports, "revolved only around the question whether to set a hearing at a later date" while "the magistrate judge's October 9, 2002, conference concerned the question whether to schedule a full hearing on the motion," which the magistrate judge never scheduled.  *Id.* at 1188-89.

The D.C. Circuit found further that Sturdza did not "receive a hearing at any time after the district court declined to adopt the magistrate judge's recommendation."  *Id*. at 1189.  The show cause hearings this court ordered her to attend, but which she refused to attend, the D.C. Circuit points out, were "to determine 'why she should not be ordered to undergo a mental examination by a licensed psychiatrist,' not to answer the ultimate question whether to appoint a guardian."  *Id.*

Having determined that this Court did not afford Sturdza due process of law by failing to provide her notice and opportunity to be heard, the D.C. Circuit instructed this Court regarding two warnings that it should have given Sturdza in order to provide the process that the D.C. Circuit, under the circumstances, believes is her due.  The D.C. Circuit stated that this Court should have informed Sturdza that in determining whether to appoint a guardian for her, "it would [1] consider any failure on her part to comply or to submit to psychiatric evaluation."  *Id.*  "So long as [2] the district court also made clear to Ms. Sturdza that she could seek to dismiss her case without prejudice if she wished to avoid either a psychiatric evaluation or the loss of control over her litigation,  such notice would have been constitutionally adequate to allow the district court to rule on the motion if she had persisted in noncompliance."  *Id.* at 1189-90.

**E.      Proceedings in this Court Following D.C. Circuit's Second Remand**

Pursuant to the D.C. Circuit's second remand, this Court convened a hearing on May 13, 2009, for the specific purpose of affording Sturdza the opportunity to be heard on the Guardian ad

Litem Motion that the D.C. Circuit held she was not provided after its first remand.[17]  Present at

the hearing were Sturdza, Lewin, who was permitted to attend by telephone, counsel for

Demetriou, and Alyza Lewin, Lewin's partner.

Sturdza spoke for over an hour.  While lengthy, very little of what she said was new.

Contrary to the finding of the D.C. Circuit regarding the matter, this Court has "heard" Sturdza[18]

in opposition to the Guardian ad Litem Motion before and her themes do not vary as a sampling of

what Sturdza said at the most recent hearing shows:

> THE COURT:  So first with respect to the first question, this is your opportunity
> to be heard on whether the court should appoint a guardian ad litem in this case.
>
> MISS STURDZA:  Yes, I will go through a brief factual history.
>         I retained Mr. Lewin on a contingency basis.  But shortly after that, I
> realized that he misled the court by filing a misleading brief and incomplete
> appendix and a misleading oral argument.

---

[17]  The D.C. Circuit's holding that this Court did not give Sturdza notice and an opportunity to be heard "as there was no proceeding that she was told would be her opportunity to convince the court that the appointment of a guardian was unnecessary," *Sturdza*, 562 F.3d at 1189, is entirely *ipsit dixit.*  It is difficult to reconcile the D.C. Circuit's determination with the record of the pertinent proceedings summarized *supra*, including the fact that: (1) the record and the Guardian ad Litem Motion was remanded to this Court for its disposition; (2) the Guardian ad Litem Motion was referred to a United States Magistrate Judge "for his Hearing and Recommendation" by an order that specifically and clearly indicated the purpose of the referral; (3) the magistrate judge scheduled and held a hearing on the Guardian ad Litem Motion, denoted as such, at which Sturdza spoke and was heard on the subject of the hearing; and (4) following the hearing the magistrate judge determined that on the merits Lewin had not shown that the appointment of a guardian was appropriate.
      The D.C. Circuit' two-sentence characterization, supplemented with quotations, taken out of context, of the pertinent proceedings in this court is not only wrong but slights the record to a remarkable and lamentable degree.

[18]  This Court has also reviewed her copious written submissions on the question of whether a guardian should be appointed, including Sturdza's reply to Lewin's objections to Magistrate Judge Facciola's recommendation that this court deny the Guardian ad Litem Motion. As has been indicated, *supra*, Sturdza's reply was set forth in a six-page memorandum that was accompanied by thirteen exhibits spanning seventy-one pages.

Tr. of Hr'g Before the Honorable Henry H. Kennedy, Jr. at 4 (May 13, 2009) ("Second Remand Tr.").

> MISS STURDZA:  And the [D.C. Circuit] also said that he might file this as an amicus of the court.  But that rule about the amicus of the court doesn't apply either, because he is a defendant in three cases that are pending in this court and in the [D.C. Circuit].  Because he, during this eight years, totally destroyed my reputation.  I lost all potential clients. Anybody who I contact, they just enter the internet and they see that Mrs. Sturdza has a guardian to talk for her.  So who will give to Mrs. Sturdza money to design their building?

*Id*. at 7.

> MISS STURDZA:  Mr. Lewin's false allegations are complete fabrications and cannot be used by the court, although the court used them up to now.  And in all the memorandum opinions, you see there all sorts of words attributed to me, they come from Mr. Lewin's fabrications.

*Id.* at 8.

> MISS STURDZA:  And the conservator here cannot be appointed before the value of my property is established.  And that value was never, never established because . . . discovery was not properly effected. . . . My former lawyers did not request discovery at all.  And that's what prompted me to analyze their acts.  And it looked like they worked against me one-by-one up to now.  They did not produce any discovery for me at all.
>
> In the court Mrs. Kotelly used all the technicalities to go around discovery.  And this is a fact –

*Id.* at 12.

> MISS STURDZA:  Oh, now I think that the court cannot force a plaintiff to keep her counsel who work against her interest.  It is absolutely clear that he worked against my interest.  He let two of the counts – he maintain that he won for me in the [D.C. Circuit] the majority of the counts, of the nine counts.  But he let two be dismissed.  One was dismissed and he did not file motion for reconsideration in the [D.C. Circuit]; and he did not file a petition in the Supreme Court for that count.  And that count was a discrimination, which is the most important, the most valuable of all [the counts].
>
> The second one was the question about the breach of contract sent to . . . the D.C. Court of Appeals, . . . I think.  And I told him that question, that question he should have filed a motion for reconsideration of, of the panel on that, because that order was totally wrong.

*Id.* at 15–16.

> MISS STURDZA:  So my firm was licensed in D.C.  And I gave all this
> information to Mr. Lewin, and Mr. Lewin did not use it in the brief, and did not use
> it in the oral argument.  Why?  He did not.  And, so, they sent that certified
> question and I send this information again.  I ask Mr. Lewin why are you not filing
> a motion for reconsideration.  We have here all this information that can be given,
> still given to the court even now.  And he refused.  And he said only that . . . a
> petition to the Supreme Court will take time.  But since then seven years have
> passed around the guardian.
>
> Meanwhile my firm got damaged; my finances because . . . when I started
> this project, I thought I may have the opportunity to get to build this building and I
> would become famous.

*Id.* at 19–20.

> THE COURT:  There are other questions that I indicated would be addressed here,
> including the question as to whether you will undergo, at my order, a psychiatric
> exam before my determining whether to appoint a guardian ad litem. . . .

> MISS STURDZA:  My answer is, to all three questions, guardian, psychiatric, and
> move to dismiss, is no, no, no.  I do not move to dismiss.  I don't think there is any
> reason for a psychiatric evaluation, as I stated, not whatsoever.  And there is no
> reason to . . . appoint a guardian, not whatsoever.  So why should I move to dismiss
> when there is no need for anything?
>
> And I am here because this court up to now, due to the acts of my lawyers,
> who did not obtain discovery for me at all, for ten years, cause me huge damages,
> first monetary, but my time.  I am here pro se because I cannot trust another lawyer
> to do the same thing.  If I find one, great.  But I didn't find one yet to trust.

*Id.* at 25–27.

> THE COURT:  Why do you believe Judge Kotelly dismissed your case?

> MISS STURDZA:  That's a good question.  I don't know.

> THE COURT:  Have you ever written anything indicating your belief as to why she
> did that?

> MISS STURDZA:  I don't think I did.  I don't think I did, no.  But in any case,
> even if I believe something I might be totally wrong.  I have no way of knowing.  I
> don't have any details, I don't have any proofs, I didn't hear anybody talking about
> it.  It's just my guess that maybe UAE is our friend.  I remember telling Judge
> Facciola that UAE is friend of our country. . . .

THE COURT:  Excuse me, Miss Sturdza.  What does that have to do with anything, actually?

MISS STURDZA:  Maybe United States doesn't want to, to sour the relations because of me. . . .

THE COURT:  What does that have to do with your suit, or the question as to whether a guardian ad litem should be appointed?

MISS STURDZA:  With a guardian, it doesn't, not directly.  But I am not the UAE representatives in this case.

I did conduct a development in here, a – just they build a building.  And that is something that is not protected by any law.  And they should be accountable for infringing my copyright.  And everybody that is represented – has represented me, or whoever is involved in this lawsuit, may think that my damage here is insignificant to, to sour the relation with another country that is our friend.

*Id.* at 31–33.

The proceeding concluded at 3:49 p.m., more than an hour after it began.  *See id*. at 42.

## II.  ANALYSIS

This Court has granted the Guardian ad Litem Motion essentially for the reasons stated in the Court's September 28, 2005 Memorandum, the crux of which is set forth *supra*. Memorandum Opinion and Order (September 28, 2005) [#173].  To reiterate, "[This Court] does not believe that [Sturdza] is capable of making responsible decisions concerning this pending litigation" because she is irrational regarding this case.  *Id*. at 4.  Such irrationality renders her an "incompetent person" as that phrase is used in Rule 17(c) of the Federal Rules of Civil Procedure and a "client with diminished capacity" as that phrase is used in  Rule 1.14(1) of the District of Columbia Rules of Professional Conduct.  *See* Fed. R. Civ. P. 17(c) & D.C. Rules of Prof'l Conduct R. 1.14(1).  The Court makes these findings based upon the entire record of this case, including the three oral presentations Sturdza made in this Court – the first two before the D.C.

38

Circuit's second remand – when she spoke to, and was heard on, the question of whether a Guardian ad Litem should be appointed.  The Court must base its findings on the record as is because, while this Court would much prefer to have the benefit of a mental health professional's opinion regarding Sturdza's "competency" and "capacity,"  Sturdza will not permit an evaluation to be done.  Further, as Lewin explained to the Court at the hearing on the Guardian ad Litem Motion, mental health professionals understandably are unwilling to render an opinion regarding Sturdza's mental status without an examination of her because "it [would be] unethical for them to do so . . .".  Facciola Tr. at 16.

Aside from her own heartfelt opinion that there is no need for a guardian, the primary reason for Sturdza's opposition to the Guardian ad Litem Motion is that she does not trust Lewin because he "fabricates" things.  She also believes Lewin, for reasons known only to himself, is working to sabotage her case.[19]  In assessing Sturdza's use of the term "fabricate" and similar accusatory language, one must understand that Sturdza was born in Romania and English is not her first language.  Therefore, in addition to sometimes being misunderstood because of her accent, Sturdza often uses words – particularly those she employs to express her position on the Guardian ad Litem Motion – that, in the context in which they are spoken, are bereft of their natural meaning.  When Sturdza accuses Lewin of "fabricating" and "sabotaging," she is not speaking so much – if at all – of mendacity but, rather, of her strong disagreement with Lewin's

---

[19]  Needless to say, Sturdza does not agree with the D.C. Circuit that Lewin has proceeded with the "utmost propriety" and has conducted himself admirably in "resist[ing] [Sturdza's] *desire to make 'poor legal arguments' or 'unsubstantiated factual allegations' . . . .*" *Sturdza*, 281 F.3d at 1287 (emphasis added).  Also, the proposition that if Lewin is successful in sabotaging her case he too will lose apparently does not affect Sturdza's thinking about what drives him.

strategic choices and of legal precepts that she does not understand.  She uses similar accusatory

language regarding the conduct of other lawyers who have represented her and certain rulings of

this Court and the D.C. Circuit.  Thus, Sturdza said of Lewin:

> MS. STURDZA:  *Mr. Lewin is lying all the way* and I will never accept a
> guardian ad litem.
> That will never happen.  I have all these proofs.  Mr. Lewin promised me
> when we met that he will an have appeal de novo and he did not.
>
> THE COURT:  He will have an appeal what?
>
> THE WITNESS:  De novo.
>
> THE COURT:  De novo?
>
> MS. STURDZA:  Yes.  And he did not plead many of the counts.  Let me explain
> the three major things.  The criminal copyright he did not plead at all.  He said
> later on, later.  The second is the civil rights discrimination.  He did not plead and
> I explained it here perfectly.

Kennedy Tr. at 28 (emphasis added).

With respect to a key ruling of the D.C. Circuit she said,

> MS. STURDZA:  Your Honor, I need to respond to Mr. Lewin at least.  Mr.
> Lewin accused me of stopping him from sending the question to the Court of
> Appeals.  That question is about a D.C. license.  This embassy is built in the
> International Center which is a development of 24 embassies.  Congress made a
> special law for those 24 embassies.  The National Capital Planning Committee
> made the rules of how to build the buildings instead of the D.C. rules and
> regulations of zoning.  And Congress said, in Public Law 90 and as modified at
> the 97th Congress, said that NCPC development controls replaces the D.C. zoning
> regulations.
> An architect needs a license for D.C. only to comply with the D.C. zoning.
> This building is in the International Center and does not have anything to do with
> that.  And they did this law especially for the foreign embassies.  They encouraged
> all these countries to have buildings designed in their architectural heritage, in
> their culture. . .
>  A D.C. license is not necessary, period.  There is no law.  Nobody requires it.  No
> one asked for it.  Nobody.  *This is just a fabrication of Mr. Lewin.  He fabricates
> things.  It is all a fabrication.*

Kennedy Tr. at 32-33 (emphasis added).

With respect to a ruling of this Court, Sturdza said:

MS. STURDZA:  Why I did not have any discovery?  I was prevented from asking any question whatsoever.  I had zero words on discovery, and I was forced by Judge Kotelly, *I was forced several times by Kotelly with my previous lawyer, Covington and Burling, to answer three times to interrogatories and twice to production of documents.*  And when Ron Dofe (phonetic) asked Judge Kotelly to serve questions on my part, she said no.  The discovery session was open.  Why did she say no?  Can you answer that?

Facciola  Tr. at 20 (emphasis added).

Finally, in assessing Sturdza's opposition to the Guardian ad Litem Motion, it is apparent that Sturdza's resistance is inextricably intertwined with her view of the merits of her case, as well as her suspicion that everyone involved in this case – with the possible exception of Magistrate Judge Facciola[20] – are wrongdoers who, either deliberately or unwittingly, are standing in the way

_____

[20]  In this regard Sturdza focuses on what the magistrate judge said in his Report and Recommendation and the magistrate judge's recommendation that the Guardian ad Litem Motion be denied because he "[could not] possibly describe this intelligent, albeit demanding, woman as incapacitated in the sense that I would not trust her with a checkbook or fear for her safety or health if a guardian was not appointed."  *Sturdza*, 2003 WL 102991, at *4.  This Court, however, is not required to ignore what the magistrate judge said during his hearing on the Guardian ad Litem motion.  The magistrate judge said:

Well, counsel, let me tell you exactly where I am in my thinking on this.  And I think it's important for everybody to know that my thinking on this is informed by my own experience.  I don't know if you know this, but for many years I was Chief of Special Proceedings in the U.S. Attorney's Office, and I spent a good chunk of my professional life dealing with the problems of mental health issues, all right?

I am fairly well convinced, on the basis of what I have seen, that Ms. Sturdza is showing every indication of acute paranoiac delusions.  All right?  Now, I don't know if a competent mental health professional would now find them to border on psychosis, but there is every existence of every element of that syndrome in this case that I have ever seen.

To get to the point that Mr. Lewin is making I have, by virtue of my work on this case and other contexts, the delusion or the assertion that Mr. Lewin is part

of her effort to gain a monetary recovery that will compensate her justly for being unfairly and

grievously deprived of an opportunity of a lifetime.  As Sturdza put it, had she not been cheated

she would have had "everything that a designer wishes in the world."  Kennedy Tr. at 11.  And,

what makes matters worse is Sturdza's suspicion that this Court, the D.C. Circuit, and her lawyers

are working together to undermine her case because of their concern that if she is successful in her

suit the friendly relations between the UAE and the United States will be "sour[ed]."  Second

Remand Tr. at 32, 33.

Having granted the Guardian ad Litem motion and set forth its reasons for doing so,

normally this Court would end its exposition here.  There are two aspects of the D.C. Circuit's

second remand order, however, that warrant further comment.  First, the D.C. Circuit held that

due process required this Court to inform Sturdza that, in determining whether to appoint a

guardian for her, this Court would "consider any failure on her part to comply or to submit to

psychiatric evaluation."  *Sturdza*, 562 F.3d at 1189.  Read literally, this language seems to operate

to require Sturdza to actually defy a court order to present herself for a mental examination – one

actually scheduled to take place – before the Court would be able to consider her unwillingness to

---

of some conspiracy to get her is, in my view, a clear indication of mental illness.
  So therefore, if you're asking me where I am in my thinking, I think that
Ms. Sturdza has serious mental health problems.  There's no doubt in my mind
that that's true.

Facciola Tr. at 11–12 .

The magistrate judge's reference to "my work on this case" likely included the Report
and Recommendation he crafted following the referral to him of Demetriou's motion for
attorneys fees that was filed after this Court (Kollar-Kotelly, J.) had dismissed, or granted
summary judgment against Sturdza as to, all of her claims against Demetriou.

comply on the ultimate question presented by the Guardian ad Litem Motion.  This court trusts that the D.C. Circuit does not mean for its words to be read in this way and that Sturdza's several statements to this Court that she will not undergo a mental examination, and her defiance of this Court's order to submit names of psychiatrists to conduct such an examination, is a sufficient basis, consistent with due process precepts, for considering her unwillingness to comply.  This Court does not believe that the D.C. Circuit means to convey that due process requires the Court to engage in a futile and burdensome exercise of finding a psychiatrist willing to perform an examination, who then would schedule an appointment, which would not be kept, but for which the psychiatrist would have to be compensated.  These are unnecessary and "weedy" problems that a literal reading of the D.C. Circuit's second remand order would bring about.

Second, the D.C. Circuit held that due process precepts require this Court, before considering Sturdza's unwillingness to comply with an order for a mental examination on the question of whether a guardian should be appointed, to "ma[ke] clear to Ms. Sturdza that she could seek to dismiss her case without prejudice if she wished to avoid either a psychiatric evaluation or the loss of control over her litigation . . . ."  *Sturdza*, 562 F.3d at 1189.  The main problem with this notice is that it contemplates suggesting a course of action to an irrational litigant that, if taken, would likely result in that litigant forfeiting her opportunity for a resolution of her claims on their merits.  That is, she would gain control of her litigation by dismissing this case without prejudice, but any litigation that she might initiate following the dismissal would likely be precluded by the running of the statutes of limitations on her claims.  This is because "once a suit is dismissed, even if without prejudice, the tolling effect of the filing of the suit is wiped out and the statute of limitations is deemed to have continued running from whenever the

cause of action accrued, without interruption by that filing." *Ciralsky v. CIA*, 355 F.3d 661, 672

(D.C. Cir. 2004) (internal quotation omitted).  Suffice it to say that such a result would not be a

just resolution of this dispute.

### III.  CONCLUSION

For the foregoing reasons, the Court has granted the Guardian ad Litem Motion.  If this

Court's ruling is appealed, the D.C. Circuit is urged to resolve finally this motion, which was

presented to it more than seven years ago.  If the D.C. Circuit disagrees with this Court that the

Guardian ad Litem Motion is, without more, ripe for its consideration on appeal, this Court urges

the D.C. Circuit to hear Ms. Sturdza itself, something it has not done to date.

An appropriate order appointing Martin Baach as guardian ad litem for Sturdza

accompanies this memorandum.[21]


Henry H. Kennedy, Jr.
United States District Judge


Dated: July 23, 2009

---

[21]  I first had contact with Mr. Baach when I was a judge on the Superior Court of the District of Columbia and Mr. Baach was an attorney who volunteered his services as a guardian ad litem in medical emergency situations.  One such situation required the court to appoint a guardian ad litem to act on behalf of a child who needed a transfusion of blood in connection with a critical surgical procedure when the child's parents would not consent to the transfusion on religious faith grounds.  Mr. Baach served admirably as the guardian ad litem for the child.
This Court expresses its appreciation for Mr.  Baach's continued willingness to serve as guardian ad litem in this case.  Mr Baach is presently a member of the United States District Court for the District of Columbia Committee on Grievances (2008 to 2010) and served as Chair of the District of Columbia Court of Appeals Board on Professional Responsibility from 2004 to 2007.